NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220355-U

NO. 4-22-0355

IN THE APPELLATE COURT

FILED
May 23, 2023
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| JOSHUA RICHARDSON, | ) | No. 18CF142 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht and |
| | ) | Matthew J. Fitton, |
| | ) | Judges Presiding. |

---

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, holding that:

(1) the trial court's misleading admonition did not render defendant's jury waiver invalid;

(2) defendant was not deprived of his right to a fair trial before an unbiased trier of fact;

(3) defendant failed to establish the trial court failed to accurately recall crucial trial evidence in finding him guilty;

(4) the trial court did not violate defendant's right to be present at all critical stages of the proceedings by viewing an admitted video recording in chambers;

(5) the cumulative effect of multiple errors did not deprive defendant of a fair trial; and

(6) the trial court's finding that defendant failed to demonstrate possible neglect of the case at a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), was not manifestly erroneous.

¶ 2    Defendant, Joshua Richardson, appeals his convictions for four counts of predatory criminal sexual assault of a child and two counts of criminal sexual assault. Defendant argues: (1) his jury waiver was not knowing and voluntary, (2) he was deprived of his right to a fair trial by an unbiased trier of fact, (3) he was deprived of his right to a fair trial because the trial court based its finding of guilt on misremembered evidence, (4) the trial court violated his constitutional right to be present at all critical stages of the proceedings, (5) the cumulative effect of multiple errors deprived him of a fair trial, and (6) the matter should be remanded for further posttrial proceedings because he demonstrated possible neglect of the case during a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was charged with four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)). Specifically, the amended information alleged defendant placed his penis in the vaginas and mouths of his daughters, F.R. and D.R., at a time when he was 18 years old or older and the victims were under the age of 13 years old. The amended information alleged the offenses concerning F.R. occurred "[o]n or about August 13, 2014 through May 15, 2018," and the offenses concerning D.R. occurred "[o]n or about July 19, 2008 through July 19, 2015." Defendant was also charged with two counts of criminal sexual assault (*id.* § 11-1.20(a)(3)) in that, on or about July 19, 2015, through May 15, 2018, he placed his penis in the mouth and vagina of D.R. when D.R. was under the age of 18 years old.

¶ 5    On October 11, 2018, defendant appeared before the trial court with counsel and waived his right to a jury trial in the instant case and in Livingston County case No. 18-CF-161,

which was also pending. Defendant indicated no one forced him to waive his right to a jury trial, no one promised him anything, and he understood his waiver meant that the court alone would determine whether the State had met its burden of proof rather than a jury. The court stated, "And once you waive your right to a jury trial, you cannot get it back. So if you decide later today or next week or whenever we start the trial that you'd rather have a jury, you will not get a jury trial. It would only be a bench trial." Defendant indicated he understood. The court later asked, "Knowing that this is a permanent waiver of your right to a jury trial, do you still wish to waive that right?" Defendant replied, "Yes, ma'am." The court found defendant had knowingly and voluntarily waived his right to a jury trial and set the matter for a bench trial.

¶ 6        Following a bench trial in Livingston County case No. 18-CF-161, defendant was convicted of four counts of predatory criminal sexual assault of a child for offenses involving two of his sisters, including S.W. On February 1, 2019, the trial court imposed consecutive life sentences on all four counts.

¶ 7        On April 25, 2019, a bench trial commenced in the instant case. Immediately prior to the trial, the trial court conducted a hearing on the State's previously filed motion to admit S.W.'s testimony under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)). The State asserted S.W. "would be testifying to basically the same matters that were testified to in [Livingston County case No.] 18-CF-161." The State indicated that S.W. would testify concerning an incident that occurred when she was approximately 10 years old in which defendant called her into his bedroom and placed his tongue, hand, and penis on her vagina. The court granted the motion, finding the prejudicial effect of the evidence was outweighed by its probative value. The court found, based on its recollection of S.W.'s testimony in the prior case and the State's proffer, that there were considerable factual similarities between

S.W.'s proposed testimony and the charged offenses, including the ages of the victims, the type of sexual conduct alleged, and the relationship between defendant and the victims.

¶ 8        The State called 10-year-old F.R. as its first witness. F.R. testified that she was six years old the first time she remembered defendant touching her inappropriately by rubbing his penis on her vagina. After this incident, defendant told her he would go to jail if she told anyone what happened. F.R. did not tell anyone about this incident because she was afraid defendant would hurt her if she did. F.R. also testified that, from the time she was seven years old until she was nine years old, defendant touched her inappropriately each time she visited him, which was every other weekend. At night, after everyone had gone to bed, defendant would make F.R. touch his penis with her hand and mouth or would place his penis in her vagina. F.R. stated she was afraid that if she told anyone about this conduct, defendant would hurt her by pulling her hair or choking her since he had done that before to punish her. She testified that she did not disclose the conduct during her first interview at the Children's Advocacy Center (CAC) because she was afraid defendant would hurt her. However, during her second interview, she discussed what had happened. The State later moved to admit a video recording of this interview into evidence. Defendant's counsel indicated he did not object, and the court admitted it into evidence.

¶ 9        D.R., who was 16 years old at the time of the trial, testified she was 6 years old the first time defendant touched her inappropriately by placing his hands on her vagina. Defendant told her that other parents did this to their children, too, and it was "fine." When D.R. was six or seven years old, defendant began placing his penis on her hand and in her mouth. The first time he placed his penis in her mouth was in his gold-colored car one night. D.R. stated she knew the incident in the car occurred in winter because she remembered it being cold. D.R.

- 4 -

testified that defendant began placing his penis in her vagina when she was eight years old, and he did this every weekend she visited him. She moved into defendant's residence when she was 13 years old, and he continued to touch her inappropriately until his arrest, which occurred when she was 15 years old. Defendant told D.R. that if she told anyone about his conduct, he would kill himself or kill everyone around him. D.R. stated she saw defendant rub his penis on F.R.'s vagina and direct F.R. to place her hands and mouth on his penis.

¶ 10     S.W., who was 22 years old at the time of the trial, testified that defendant was her brother and was approximately 17 years older than her. Defendant lived in her father's house with her for a couple of months when she was 11 years old. During that time, defendant called her into his bedroom one night, and he placed his fingers, tongue, and penis in her vagina. She did not tell anyone about the incident at the time because she did not think they would believe her. She told her sister and friend about it a couple of years later.

¶ 11     Defendant testified that he had heard D.R. testify regarding "incidents" that occurred in a gold-colored car. Defense counsel asked, "And at the time that [D.R.] describes these events as happening, can you describe the vehicle you had?" Defendant replied, "Um, from about mid August to mid September, I had a gold Dodge Intrepid. After that, the motor blew in that vehicle. I ended up buying my brother's blue Dodge *** pickup." Defendant testified that he never had any sexual contact with either F.R. or D.R. Certified copies of defendant's convictions for aggravated battery, aggravated vehicular hijacking, and predatory criminal sexual assault of a child were admitted as impeachment evidence.

¶ 12     After hearing closing arguments, the trial court continued the matter so that it could review the video recording of F.R.'s CAC interview. At the next hearing, the court indicated it had viewed the video recording and reviewed its trial notes. The court found

defendant guilty of all six counts. The court found F.R. and D.R. to be credible witnesses. The court stated:

> "[S.W.] was a credible, consistent witness and shows really the pattern that this Defendant had for assaulting and abusing young girls from a very young age, six, seven years old, and then using very controlling behavior to keep them under his thumb so to speak for years and years at a time and just robbing these young girls of their childhood."

¶ 13　　　　The trial court found defendant was not a credible witness, noting defendant had "no affect" and "stone cold eyes" during his testimony. The court stated defendant's "simple no I did not answers" as to whether he sexually assaulted D.R. and F.R. were "simply not credible at all." The court also found defendant "certainly ha[d] bias" and had "a stake in the outcome of this." The court stated defendant "exercised control and stared down these girls while they testified." It noted some of defendant's testimony corroborated the victims' testimony, including that "he owned a gold Dodge Intrepid at the relevant time period."

¶ 14　　　　At the sentencing hearing, a presentence investigation report and victim impact statements from the victims and one of their mothers were submitted. Defendant made a statement in allocution in which he stated he never sexually abused his daughters, and he was not "this monster" that the trial court and "those from without" were portraying him to be. Defendant stated he did not intend to direct a "stone cold stare" at his daughters, as the court had found, but he had always looked "pissed off" when he was serious and focused. Defendant also stated there was physical evidence and witness testimony that would have proven his innocence that was not presented, despite his requests that it be presented.

¶ 15 The trial court imposed consecutive sentences of natural life imprisonment on each of the four counts of predatory criminal sexual assault of a child and 15 years' imprisonment on the two counts of criminal sexual assault. The court stated:

> "I've got four victims. I have absolutely no doubt that there are more than four victims of [defendant]. But I have four victims who had the strength and courage to come forward and where [defendant] had physically and emotionally abused them and sexually abused them from a very young age."

The court stated defendant's failure to accept responsibility made it "extremely difficult to see how there would be any potential for rehabilitation." The court stated: "[Defendant] is a monster. He is a danger to this community. The State is absolutely correct that it is necessary for the protection of these young ladies, his daughters, his sisters and I agree his grandchildren someday need to be protected from him."

¶ 16 On direct appeal, defendant raised the first five claims raised in the instant appeal, as well as a claim that the trial court erred by failing to conduct a preliminary inquiry pursuant to *Krankel* into his *pro se* posttrial claims of ineffective assistance of counsel. *People v. Richardson*, 2021 IL App (4th) 190682-U, ¶ 2. We remanded the matter for a preliminary *Krankel* inquiry before a new judge. *Id.* ¶ 27. We declined to address the remaining issues defendant raised but noted he could raise the issues in a subsequent appeal following the *Krankel* proceedings on remand. *Id.* ¶ 24.

¶ 17 On remand, defendant, *pro se*, filed four written "declarations" detailing his claims of ineffective assistance of trial counsel. In the documents, he alleged that, on October 9, 2018, trial counsel called defendant in jail and told him Andrea Hagen, defendant's fiancée, had pled guilty to "a charge of participating in a sexual act" with one of the alleged victims and had

agreed to testify against defendant. Counsel then advised defendant against proceeding with a jury trial. Defendant told counsel he was opposed to waiving a jury trial and needed more time to think about it. Two days later, defendant was brought to court, and counsel indicated he had arranged a hearing for defendant to waive his right to a jury trial in both of the cases pending against him. Counsel stated defendant would have "no chance with a jury" and would "for sure be found guilty" with Hagen testifying against him. Defendant was "caught off guard" and agreed to waive his right to a jury trial "reluctantly and under duress." Defendant stated that, a few days later, he learned Hagen did not plead guilty to a charge of "participating in a sexual act" with one of the alleged victims, and she never agreed to testify against him. Defendant alleged counsel "purposely lied to [him]" in order to get him to waive his right to a jury trial.

¶ 18        In the declarations, defendant also stated his trial counsel was ineffective for failing to object to the trial court's inaccurate statement of the law concerning his jury waiver, "bring to the court's attention" that it had misremembered evidence in finding him guilty, and move for a substitution of judge following his trial in Livingston County case No. 18-CF-161 due to the "undeniable biased and hostile feelings" the trial court displayed toward him during that trial. Defendant asserted he told counsel he wanted a different judge for the trial in this case.

¶ 19        Defendant also asserted in the written declarations that his trial counsel was ineffective for failing to present exonerating evidence. Specifically, defendant alleged medical examinations of F.R. and D.R. were conducted after his arrest in May 2018. Defense counsel told defendant that records of these exams existed, but he indicated the State would not allow them to be "brought out as evidence" to support defendant's claim of innocence. Defendant alleged the records would have proven his innocence because they would have shown that "at no point in time" was F.R. or D.R. ever sexually assaulted.

¶ 20 Defendant also argues his trial counsel was ineffective for failing to introduce evidence of "Messenger" messages between his two ex-wives, Delissa Leonard and Tracy Richardson, who were the mothers of D.R. and F.R. Defendant stated Tracy gave him a paper copy of messages she had exchanged with Leonard in which they conspired to "set [defendant] up" with false accusations of sexual abuse involving D.R. and F.R. Defendant asserted he gave these messages to Janine Boggs, his former attorney. Boggs assured him she would give the messages to his public defender. Defense counsel in the instant case confirmed he had received the messages and told defendant they would be "brought up during trial proceedings," but they never were.

¶ 21 Defendant also argued his trial counsel was ineffective for failing to interview and call multiple witnesses who would have supported and proven his innocence to testify on his behalf. These witnesses included, among others, Hagen, Dayna Richardson (defendant's daughter), David Richardson (defendant's son), and Boggs. Defendant summarized what he believed each of these witnesses would have testified to.

¶ 22 A hearing was held on defendant's *pro se* claims of ineffective assistance of counsel before a different judge than the one who had presided over the trial. At the hearing, the trial court indicated it would take judicial notice of the written declarations and asked defendant to summarize his arguments. Defendant read one of his four written declarations, which set forth his main arguments. Defendant noted that the other written declarations contained more detailed information concerning the witnesses who should have been called by trial counsel and the evidence counsel should have presented.

¶ 23 In response, trial counsel stated that, after both the instant case and Livingston County case No. 18-CF-161 had been set for trial, he advised defendant he had been informed

that Hagen would be pleading guilty to permitting the sexual abuse of one of the alleged victims in the instant case. Counsel advised defendant he did not believe Hagen would be a beneficial witness to him because she had already admitted "to allowing something to have happened." He also told defendant he did not believe it would "go over well in front of a jury" if the defense called Hagen as a witness and she admitted "those things had occurred and that she was aware of them." Counsel stated he had also been advised by an assistant state's attorney that Hagen would be on the State's witness list, and Hagen's counsel had previously indicated he had advised her not to testify as a witness for defendant.

¶ 24    Counsel stated that, after Hagen's plea, he spoke to defendant over the phone concerning possibly waiving his right to a jury trial. Counsel told defendant he would be brought to court to execute the jury waiver, but he did not tell him exactly when because the court date had not been set yet. When defendant was brought to court, counsel again discussed the benefits and dangers of a jury trial versus a bench trial, and defendant chose to waive his right to a jury trial "of his own free will." Counsel told defendant he believed for several reasons that a bench trial would be better in the instant case. However, he advised defendant that it was ultimately defendant's choice.

¶ 25    Counsel noted defendant had discussed wanting a different judge after the trial in in Livingston County case No. 18-CF-161. Counsel explained to defendant that he did not believe there was a basis for filing a motion to substitute the judge for cause based on the judge finding him guilty in Livingston County case No. 18-CF-161.

¶ 26    Counsel stated there were "certain types of evidence" defendant believed would be beneficial that "may not have been relevant" and "may not have been admissible." Counsel stated a victim's alleged sexual experiences with other individuals would not have been relevant

or admissible, and a victim's experience of physical or mental abuse with other individuals would not have been relevant. Counsel stated he explained to defendant that the evidence they presented had to have relevance to the case as a whole and "could not be hearsay in nature where someone is commenting on what somebody else says, could not be of the nature of what someone else believes did or didn't happen."

¶ 27 Counsel initially stated that no medical exams had been done on the victims. Defendant then gave more detailed allegations concerning medical exams that were done during a juvenile case prior to the instant case. Regarding these allegations, counsel stated that a juvenile case had been filed against defendant concerning all of his daughters in addition to the criminal cases, and he represented defendant during the juvenile case as well. Counsel stated he discussed the evidence with defendant at that time. Counsel indicated he told defendant "there was no physical evidence, there was no DNA evidence, there was nothing which we could use to put forth a defense in that particular respect due to the fact that these were allegations that had occurred some time ago, and so, that evidence would not be available to us."

¶ 28 The trial court stated it had considered defendant's filings and the arguments made at the hearing. The court found that whether a bench trial would be more beneficial than a jury trial was a matter of strategy, and defendant ultimately agreed to proceed with a bench trial after discussing the matter with counsel. With regard to counsel's failure to file a motion to substitute judge following the trial in Livingston County case No. 18-CF-161, the court stated: "[T]he fact that a judge rules against you in one case, in and of itself, unless there is a clear showing of prejudice, which apparently there was not in this matter, that does not exclude that judge from trying the other case." The court found that trial counsel had not fallen below the level of providing an adequate defense. The court found the issues raised by defendant were

"strategic in nature" and found that defendant had not proven that his counsel had not

"performed to the level of his profession." This appeal followed.

¶ 29                                        II. ANALYSIS

¶ 30         On appeal, defendant argues: (1) his jury waiver was not knowing and voluntary,

(2) he was deprived of his right to a fair trial by an unbiased trier of fact, (3) he was deprived of

his right to a fair trial because the trial court based its finding of guilt on misremembered

evidence, (4) the trial court violated his constitutional right to be present at all critical stages of

the proceedings, (5) the cumulative effect of multiple errors deprived him of a fair trial, and

(6) the matter should be remanded for further posttrial proceedings because he demonstrated

possible neglect of the case during the preliminary *Krankel* inquiry.

¶ 31                                        A. Jury Waiver

¶ 32         Defendant argues his jury waiver was not knowing and voluntary because it was

made following the trial court's inaccurate admonishment. Specifically, defendant contends the

court incorrectly advised him that his jury waiver was permanent and that he would not receive a

jury trial if he later changed his mind regarding the waiver. Defendant asserts this admonition

was incorrect because, while he did not have an absolute right to withdraw his jury waiver, the

court was required to consider a request to withdraw the jury waiver and could deny such a

request only after exercising its discretion. Defendant contends he would have had grounds for

requesting to withdraw his jury waiver after the court expressed "strong opinions about [his]

character and credibility as a witness" following the bench trial in in Livingston County case No.

18-CF-161. Defendant also asserts that the court's misleading admonition amounted to a

"blanket policy" that it would not permit him to withdraw his waiver under any circumstances,

and it prevented him from making a knowing and voluntary decision about whether to seek to withdraw his jury waiver.

¶ 33    "The right to a trial by jury is a fundamental right guaranteed by our federal and state constitutions." *People v. Bracey*, 213 Ill. 2d 265, 269 (2004). A defendant may waive the right to a trial by jury, but a jury waiver must be knowingly and understandingly made to be valid. *Id.* The question of whether a jury waiver is valid turns on the particular facts and circumstances of each case, and the trial court need not impart to the defendant any "set admonition or advice." *Id.* at 269-70. "A jury waiver will not be held invalid where a defendant unambiguously chooses a bench trial with his counsel at his side unless some prejudice to the defendant is alleged and proved." *People v. Akis*, 63 Ill. 2d 296, 300 (1976). Once a defendant has voluntarily elected to waive his right to a jury trial, the defendant cannot withdraw the waiver as a matter of right. *People v. Catalano*, 29 Ill. 2d 197, 202 (1963). "Whether the accused will be permitted to withdraw the waiver is ordinarily within the discretion of the trial court unless the circumstances indicate that the defendant did not realize the consequences of his jury waiver." *Id.*

¶ 34    Defendant acknowledges he failed to preserve this issue by raising it in the trial court but argues we may consider it under either prong of the plain error doctrine. Under the plain error doctrine, we may review unpreserved error when "a clear and obvious error occurs and: (1) the evidence is closely balanced; or (2) that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). The first step under either prong of the plain error doctrine is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

- 13 -

¶ 35    We find the Second District's decision in *People v. McIntyre*, 2022 IL App (2d) 200535, to be instructive. In *McIntyre*, the trial court advised the defendant at the time he waived his right to a jury trial that, once he waived the right, he could not " 'change [his] mind and take it back.' " *Id.* ¶ 3. On appeal, the defendant argued his jury waiver was not valid because the trial court's erroneous admonition left him with the mistaken impression that there was no possibility he could withdraw the waiver. *Id.* ¶ 6. The defendant acknowledged he had forfeited the issue but argued it was reviewable under the second prong of the plain error doctrine. *Id.* ¶¶ 7, 11. The *McIntyre* court held that, while the trial court's admonition was misleading, it did not affect the validity of the jury waiver because the defendant was not prejudiced by the admonition. *Id.* ¶ 9. The court stated: "Since defendant was willing to make an irrevocable waiver of the right to a jury, we have no reason to believe he would have been unwilling to make a potentially revocable waiver." *Id.* The *McIntyre* court acknowledged that the misleading admonition could have affected the defendant's postwaiver decision-making but found any error in that regard did not rise to the level of second-prong plain error. *Id.* ¶¶ 10-12.

¶ 36    Here, like in *McIntyre*, the trial court's admonition concerning defendant's jury waiver was misleading. The court advised defendant that if he decided after the waiver that he would rather have a jury trial, he would not receive a jury trial and would only have a bench trial. This comment conveyed that, once defendant waived his right to a jury trial, there would be no possibility to withdraw the waiver. While defendant was not entitled to withdraw the jury waiver as a matter of right, he could have still moved to withdraw the waiver, and the decision as to whether to grant the motion would have been within the trial court's discretion. *Id.* ¶ 8; see *People v. Todd*, 178 Ill. 2d 297, 316 (1997).

¶ 37    However, as in *McIntyre*, we find the court's misleading admonition did not affect the validity of defendant's jury waiver because defendant suffered no prejudice regarding his decision to waive a jury trial. As the *McIntyre* court noted, if defendant was willing to make an irrevocable waiver of his right to a jury trial, there is no reason to believe he would not have been willing to make a possibly revocable waiver. See *McIntyre*, 2022 IL App (2d) 200535, ¶ 10; see also *Todd*, 178 Ill. 2d at 316 (holding the defendant was not prejudiced by his counsel's inclusion of a provision in his jury waiver form stating he would be forever barred from requesting a jury if the court accepted his waiver because the challenged provision indicated the consequences of waiver were more onerous than they actually were and imposed a disincentive for waiver).

¶ 38    We acknowledge, as did the *McIntyre* court, that the trial court's misleading admonition could have affected defendant's postwaiver decision-making. However, the only question before us in this appeal is whether the misleading admonition rendered defendant's jury waiver invalid, and we have concluded that it did not. As defendant never moved to withdraw his jury waiver in the trial court and has not argued on appeal that his trial counsel provided ineffective assistance by failing to file a motion to withdraw his jury waiver, we are not tasked with deciding any potential postwaiver claims of error.

¶ 39    We conclude defendant has not established that a clear or obvious error occurred with regard to his claim that the trial court's admonition rendered his jury waiver invalid, and, accordingly, he is not entitled to relief under the plain error doctrine. See *Bannister*, 232 Ill. 2d at 71 ("Having found no error, there can be no plain error.").

¶ 40                                B. Judicial Bias

¶ 41    Defendant argues he was deprived of his right to a fair trial because the judge who presided over the trial was biased against him due to the information she learned and conclusions

- 15 -

she drew as the trier of fact during the bench trial in Livingston County case No. 18-CF-161. Specifically, defendant notes the trial judge in Livingston County case No. 18-CF-161 found that he was not a credible witness and that his language and manner while testifying showed he was hiding things, thought he was " 'smooth,' " and thought he would be able to " 'talk his way out of it.' " *People v. Richardson*, 2021 IL App (4th) 190184-U, ¶ 9. Defendant also notes the judge found S.W. to be a credible witness in the prior case. *Id.* Defendant further notes that during the sentencing hearing in in Livingston County case No. 18-CF-161, which is included in the record in this appeal, the judge stated defendant manipulated his victims and continued to "lie and manipulate to get himself out of trouble."

¶ 42 Defendant acknowledges he failed to raise this argument in the trial court. However, he argues forfeiture should not bar review of this issue because the conduct of the trial court was at issue. See *People v. Sims*, 192 Ill. 2d 592, 636 (2000) ("[T]he procedural default, or waiver, rule is not rigidly applied where the basis for the objection is the conduct of the trial judge."). Alternatively, defendant argues the issue may be reviewed under either prong of the plain error doctrine. See *Bannister*, 232 Ill. 2d at 65. Even if we were to find defendant's failure to preserve the issue does not bar our review of it, we find defendant has failed to establish he was deprived of his right to a fair trial due to judicial bias.

¶ 43 "In a criminal prosecution, the defendant has a constitutional right to a fair trial before an unbiased and open-minded trier of fact." *People v. Hardin*, 2012 IL App (1st) 100682, ¶ 14; U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. " 'A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice.' " *People v. Covington*, 395 Ill. App. 3d 996, 1009 (2009) (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002)). "A judge's rulings alone almost never constitute a valid

basis for a claim of judicial bias or partiality." *Eychaner*, 202 Ill. 2d at 280. Moreover, the fact that a judge has ruled adversely to a party in a civil or criminal case ordinarily does not disqualify the judge from sitting in subsequent civil or criminal cases in which that person is a party. *People v. Vance*, 76 Ill. 2d 171, 178 (1979). "Rather, the party making the charge of prejudice must present evidence of prejudicial trial conduct and evidence of the judge's personal bias." *Eychaner*, 202 Ill. 2d at 280.

> " '[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.' " *Id.* at 281 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

A showing of "animosity, hostility, ill will, or distrust" against the defendant is necessary to establish "the actual prejudice which would interfere with a fair determination of defendant's guilt or innocence." *Vance*, 76 Ill. 2d at 181-82.

¶ 44 We find the challenged comments the trial court made following the trial and during the sentencing hearing in Livingston County case No. 18-CF-161 did not show the judge displayed such a high degree of antagonism against defendant as to make fair judgment impossible in the instant case. It was appropriate for the judge, as the trier of fact in Livingston County case No. 18-CF-161, to assess the credibility of defendant's and S.W.'s testimony in that case. See *People v. Swenson*, 2020 IL 124688, ¶ 36. These credibility determinations did not

show the judge was incapable of being impartial in this case. While the judge's findings at the sentencing hearing in Livingston County case No. 18-CF-161 concerning defendant's manipulation of his victims were certainly critical and disapproving, we do not find the remarks rose to the level of showing a " 'deep-seated *** antagonism that would make fair judgment impossible.' " *Eychaner*, 202 Ill. 2d at 281 (quoting *Liteky*, 510 U.S. at 555).

¶ 45            We reject defendant's argument that the record shows the judge's findings and opinions formed during the trial in Livingston County case No. 18-CF-161 carried over to the instant case. Specifically, defendant notes the judge referenced her recollection of S.W.'s testimony in Livingston County case No. 18-CF-161 in finding S.W.'s testimony was admissible in the instant case under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)). However, the judge referenced her recollection of S.W.'s prior testimony only after the State indicated S.W.'s testimony in the instant case would concern "basically the same matters" as in the prior case. The judge's reference to S.W.'s prior testimony for the limited purpose of determining whether sufficient factual similarities existed between her proffered testimony and the charged offenses did not show the judge was biased.

¶ 46            Defendant also notes that, during the sentencing hearing in the instant case, the judge referenced there being "four victims," and likely more than that, even though the charges in the instant case only concerned two victims. Defendant contends this shows the judge "combined these cases in her mind, depriving [him] of an impartial trier of fact in this case." However, it was appropriate for the court to consider the defendant's criminal history—including his convictions in Livingston County case No. 18-CF-161—at the sentencing hearing. See *People v. Thompson*, 222 Ill. 2d 1, 35 (2006).

¶ 47　　　　Defendant contends the judge also showed her bias when she called him a "monster" during the sentencing hearing in the instant case. Notably, however, the judge made this comment only after finding defendant guilty of sexually assaulting two of his minor daughters on multiple occasions, and the comment was responsive to defendant's assertion during his statement in allocution that he was not "this monster" that the court and "those from without" were portraying him to be. This comment, while inflammatory, does not by itself lead us to conclude the trial judge was not impartial when she sentenced defendant.

¶ 48　　　　　　　　　　　　C. Misremembered Evidence

¶ 49　　　　Next, defendant argues his right to due process was violated because the trial court based its finding of guilt on misremembered evidence. Specifically, defendant argues the trial court was incorrect in finding S.W.'s testimony showed he had a pattern "for assaulting and abusing young girls from a very young age, six, seven years old, and then using very controlling behavior to keep them under his thumb so to speak for years and years at a time." Defendant notes that S.W. testified concerning only one incident of sexual conduct that happened when she was 11 years old. Defendant also argues the court was incorrect when it stated he partially corroborated D.R.'s testimony by testifying that he "owned a gold Dodge Intrepid at the relevant time period." Defendant contends his testimony showed he only had the gold-colored Dodge Intrepid in the summer, while D.R. testified the incident in the car happened in the winter.

¶ 50　　　　Defendant acknowledges he failed to raise this issue in the trial court but argues that forfeiture should not bar review of this claim because the conduct of the court is at issue. See *Sims*, 192 Ill. 2d at 636. Defendant also argues that the issue is reviewable under either prong of the plain error doctrine, which permits us to review unpreserved error when "a clear and obvious error occurs and: (1) the evidence is closely balanced; or (2) that error is so serious that it

affected the fairness of the defendant's trial and challenged the integrity of the judicial process."

*Bannister*, 232 Ill. 2d at 65. The first step under either prong of the plain error doctrine is to

determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 51            Our supreme court has held that a trial court's failure to recall and consider

testimony crucial to the defendant's case results in a denial of a defendant's due process rights.

*People v. Mitchell*, 152 Ill. 2d 274, 323 (1992). "Where the record affirmatively indicates that the

trial court did not remember or consider the crux of the defense when entering judgment, the

defendant did not receive a fair trial." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91; see

*People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976). However, "if a trial court's 'minor

misstatement' of the evidence did not affect the basis of the ruling, it does not violate due

process." *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39 (quoting *People v. Schuit*, 2016 IL

App (1st) 150312, ¶ 107).

¶ 52            We find defendant has not shown an error occurred in this case because it is not

apparent from the challenged comments that the trial court's recollection of the trial testimony

was incorrect. With regard to the court's comment that defendant testified that he owned a

gold-colored Dodge Intrepid during the "relevant time period," we note that this comment was

somewhat vague and that both defendant's and D.R.'s testimony lacked specificity as to the

precise timeline of events. D.R. testified the incident in the car happened sometime when she

was six or seven years old. She stated it happened in the winter because she remembered it being

cold outside. When asked what vehicle he had at the time of the incident D.R. described,

defendant stated he owned a gold-colored Dodge Intrepid from "about mid August to mid

September." Even accepting defendant's argument that this testimony shows he sold the gold

Dodge Intrepid sometime in September, we do not believe it was necessarily incorrect for the

court to describe this as being during "the relevant time period," especially given the expansive period of time in which D.R. testified the abuse occurred.

¶ 53    It is also not clear from the trial court's comments that it misremembered evidence when it indicated that S.W.'s testimony showed defendant's pattern "for assaulting and abusing young girls from a very young age, six, seven years old, and then using very controlling behavior to keep them under his thumb so to speak for years and years at a time." Both F.R. and D.R. testified that defendant first engaged in sexual conduct with them when they were six or seven years old and that they did not tell anyone because defendant had made them afraid. Although S.W. was older than F.R. and D.R. when defendant sexually assaulted her and she only testified concerning one incident of assault, her testimony showed defendant had a long pattern of sexually assaulting young girls. To the extent the court's comments concerning S.W.'s testimony were incorrect, the comments constituted only a minor misstatement of the evidence and did not affect the basis of the court's ruling. See *id.*.

¶ 54                               D. Right to Be Present

¶ 55    Defendant argues his constitutional right to be present at all critical stages of the proceedings was violated when the trial court privately viewed the recording of F.R.'s CAC interview. "Under the United States Constitution a criminal defendant has a general right to be present at every stage of his trial." *People v. Lofton*, 194 Ill. 2d 40, 66 (2000). "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Id.* at 67.

¶ 56    Defendant failed to preserve this argument by raising it in the trial court but requests that we review it under both prongs of the plain error doctrine. See *Bannister*, 232 Ill. 2d

at 65. The first step under either prong of the plain error doctrine is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 57 In support of his argument that the trial court violated his right to be present by viewing the recording outside his presence, defendant relies on the First District's decision in *People v. Lucas*, 2019 IL App (1st) 160501. The *Lucas* court held the trial court violated the defendant's right to be present when it viewed a video recording of squad car camera footage outside her presence before admitting it into evidence. *Id.* ¶¶ 5-6, 21. The *Lucas* court reasoned the video was a significant portion of the evidence against the defendant, there was no evidence the defendant was aware of the contents of the video, the defendant's absence thwarted her ability to assist in her defense, and her presence while the court viewed the video would have contributed to the fairness of the proceedings against her. *Id.* ¶¶ 14-20. In *People v. Flagg*, 2021 IL App (1st) 191692-U, ¶ 51, an unpublished decision, the First District extended the holding in *Lucas* to a trial court's viewing of admitted evidence outside the presence of the defendant.

¶ 58 Though not cited by either of the parties, we find our recent decision in *People v. Aquisto*, 2022 IL App (4th) 200081, to be dispositive. In *Aquisto*, this court rejected the reasoning in *Flagg*. *Id.* ¶¶ 82-83. The *Aquisto* court held that a judge's viewing of admitted evidence in chambers is not a " 'proceeding,' " and, accordingly, a judge viewing admitted video evidence in chambers does not violate a defendant's right to be present at all critical stages of the proceedings. *Id.* ¶ 83 (citing *People v. Maniwa*, 2021 IL App (4th) 190796-U, ¶ 31).

¶ 59 In the instant case, the video recording of F.R.'s interview was admitted without objection before the trial court viewed it privately in chambers. Accordingly, pursuant to the reasoning set forth in *Aquisto*, the court did not violate defendant's constitutional right to be present at all critical stages of the proceedings because its viewing of the admitted video

recording was not a "proceeding." See *id.* Thus, no error occurred when the court viewed the video recording outside defendant's presence, and, accordingly, defendant may not obtain relief under the plain error doctrine. See *Bannister*, 232 Ill. 2d at 71.

¶ 60                                    E. Cumulative Error

¶ 61        Defendant argues that, even if the four foregoing claimed errors are not individually grounds for a new trial, the cumulative effect of the errors deprived him of a fair trial. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). As we have found that no error occurred with respect to any of these four claimed errors, there can be no cumulative error. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 62                                    F. *Krankel* Inquiry

¶ 63        Defendant argues he demonstrated during the preliminary *Krankel* inquiry that his trial counsel possibly neglected his case such that the matter should be remanded for the appointment of independent counsel to represent him in presenting his posttrial claims of ineffective assistance of counsel. Specifically, defendant argues he showed possible neglect of the case in that trial counsel failed to (1) present exculpatory evidence, including records of online messaging and medical records; (2) interview or call witnesses who would have provided testimony supporting his theory of defense; (3) provide him with correct information concerning Hagen's guilty plea; (4) correct the trial court's misstatement of the law; (5) inform the court it had misremembered the trial evidence; and (6) request a substitution of judge for cause.

- 23 -

¶ 64    A common law procedure that developed from our supreme court's decision in *Krankel* is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. *People v. Jolly*, 2014 IL 117142, ¶ 29. Under this procedure, new counsel is not automatically appointed when a defendant raises such a claim. *Id.* Rather, the trial court must first conduct an inquiry to examine the factual basis of the claim. *People v. Roddis*, 2020 IL 124352, ¶ 35. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Id.* However, if the allegations show possible neglect of the case, the court should appoint new counsel to represent the defendant at a hearing on his claims of ineffective assistance of counsel. *Id.* ¶¶ 35-36.

¶ 65    During a preliminary *Krankel* inquiry, *"some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." People v. Moore*, 207 Ill. 2d 68, 78 (2003). The trial court is permitted to ask counsel about the facts and circumstances surrounding the defendant's *pro se* allegations, briefly discuss the allegations with defendant, and base its evaluation of the defendant's allegations on its knowledge of defense counsel's performance at trial. *Jolly*, 2014 IL 117142, ¶ 30. The trial court may consider both the factual and legal merits of the defendant's claims. *Roddis*, 2020 IL 124352, ¶ 61.

¶ 66                    1. *Standard of Review*

¶ 67    Initially, the parties disagree as to the applicable standard of review. Defendant argues his claim should be subject to *de novo* review, while the State argues it should be reviewed under the manifest error standard. Our supreme court has held that the question of

whether the trial court has conducted a proper *Krankel* inquiry presents a legal question that is reviewed *de novo*. *People v. Jackson*, 2020 IL 124112, ¶ 98. However, if the court has properly conducted a *Krankel* inquiry and reached a determination on the merits of the *Krankel* motion, the court's decision will be reversed only if it was manifestly erroneous. *Id.* "Manifest error is error that is clearly evident, plain, and indisputable." *Id.* Here, defendant does not challenge the procedure employed by the trial court in conducting the *Krankel* inquiry, but rather argues the court erred in ultimately finding defendant failed to demonstrate possible neglect of the case. Accordingly, the manifest error standard of review applies. See *Id.* ¶¶ 98, 106.

¶ 68        We reject defendant's argument that the *de novo* standard should be applied in this case because the judge who presided over the *Krankel* inquiry was not the same judge who presided over the trial and, accordingly, was in no better position to evaluate his claims than this court. Defendant cites *Roddis*, 2020 IL 124352, ¶ 56 (quoting *Moore*, 207 Ill. 2d at 79), for the proposition that the deferential manifest error standard is applied because the trial court can " 'base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face.' " However, the foregoing passage from *Roddis* does not concern the justification for the use of the manifest error standard, but rather describes some of the matters the court may consider when evaluating a defendant's *Krankel* claims. See *id.* We decline to carve out an exception to the application of the manifest error standard of review for situations where a different judge than the one who presided over the trial conducts the *Krankel* inquiry.

¶ 69                    2. *Failure to Present Exculpatory Evidence*

¶ 70        Defendant argues he showed at the *Krankel* inquiry that his trial counsel possibly neglected the case by failing to present "exculpatory evidence," including records of medical

exams of F.R. and D.R. and "Messenger" messages in which his ex-wives allegedly conspired to falsely accuse him of sexually assaulting the victims.

¶ 71            "Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v. Reid*, 179 Ill. 2d 297, 310 (1997). Such decisions are matters of trial strategy and are generally immune from claims of ineffective assistance of counsel unless "counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing." *Id.* "[C]ounsel's tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *People v. King*, 316 Ill. App. 3d 901, 913 (2000).

¶ 72            While trial counsel did not expressly address defendant's allegations concerning the "Messenger" messages at the preliminary *Krankel* inquiry, he indicated that there were "certain types of evidence" defendant believed would be beneficial that "may not have been" admissible and that he explained to defendant that trial evidence "could not be hearsay in nature." The State contends that the foregoing comments applied to the "Messenger" messages because such messages would have been inadmissible hearsay. Defendant contends counsel could have called his ex-wives to testify and lay a proper foundation for the messages. He further contends the messages were not hearsay because they could have been used "for impeachment and to cast doubt on the truthfulness of the allegations made by F.R. and D.R."

¶ 73            " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and it is generally inadmissible. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); Ill. R. Evid. 802 (eff. Jan. 1, 2011). "When the statement is used for other purposes [than proving the truth of the matter

asserted therein], such as impeachment ***, it is not hearsay." *Kincaid v. Ames Department Stores, Inc.*, 283 Ill. App. 3d 555, 566 (1996).

¶ 74    Here, assuming the "Messenger" messages described by defendant exist, they would only cast doubt on the truthfulness of F.R.'s and D.R.'s trial testimony if they were admitted for their truth. That is, the messages could only be used to impeach the credibility of F.R. and D.R. if their content was accepted as true. See *People v. Virgin*, 302 Ill. App. 3d 438, 448 (1998) ("Where a witness is impeached by a contradictory statement made out of court by another person, as opposed to by the witness himself, then the out of court statement is offered for its truth in order to attack the credibility of the witness."). Accordingly, the messages would be hearsay statements—*i.e.*, out-of-court statements offered for the truth of the matter asserted— despite their potential to cast doubt on the credibility of F.R.'s and D.R.'s testimony. As defendant has not set forth any exception to the rule against hearsay that would apply, he has not shown possible neglect of the case due to trial counsel's failure to introduce these messages at trial.

¶ 75    With regard to the alleged evidence of the victims' medical exams, counsel initially stated no such exams had taken place. Counsel also stated that, because the offenses were alleged to have occurred "some time ago," no physical evidence was available to the defense. Even if we were to accept defendant's assertion that F.R. and D.R. were examined in 2018 and that the examinations revealed no evidence of sexual assault, defendant's additional assertion that these examinations would have shown the victims were sexually assaulted "at no point in time" during the years-long periods alleged in the amended information is facially absurd. Accordingly, it is not clearly evident that the trial court erred in failing to appoint new counsel to advance this claim.

¶ 76                           3. *Failure to Interview or Call Witnesses*

¶ 77         Defendant next argues that he showed possible neglect of the case by his trial

counsel in that trial counsel failed to interview and call Hagen, Dayna, Boggs, and David to

testify as witnesses at the trial. "[D]ecisions concerning whether to call certain witnesses on a

defendant's behalf are matters of trial strategy, reserved to the discretion of trial counsel." *People*

*v. Enis*, 194 Ill. 2d 361, 378 (2000). "Such decisions enjoy a strong presumption that they reflect

sound trial strategy, rather than incompetence [citation], and are, therefore, generally immune

from claims of ineffective assistance of counsel [citation]." *Id.*

¶ 78         We find defendant did not show possible neglect of the case regarding his

counsel's failure to call these witnesses to testify at trial. In the *Krankel* proceedings, defense

counsel explained he did not call Hagen as a witness because she had pled guilty to permitting

the sexual abuse of one of the victims and her attorney had indicated he would advise her not to

testify as a defense witness in the instant case. Defense counsel also stated he expressed concerns

that, if he called Hagen, she might admit "those things had occurred and that she was aware of

them." Accordingly, the trial court could have found counsel's decision not to call Hagen as a

witness was strategic.

¶ 79         While defense counsel did not expressly address his failure to call Dayna as a

witness, defendant's assertions concerning Dayna's expected testimony indicate there were

strategic reasons not to call her. Defendant asserted Dayna would have testified that Leonard

(D.R.'s mother) forced her to make false accusations of sexual abuse against defendant two years

earlier, which would have made it more likely that Leonard also encouraged D.R. to make false

accusations. However, defense counsel could have reasonably determined that putting forth

evidence that Dayna had previously accused him of sexual misconduct would have been detrimental to defendant's case, even if she testified her prior accusations were not true.

¶ 80        Defendant also argues counsel should have elicited testimony from Boggs and David concerning D.R. being abused by Leonard's boyfriend and defendant receiving custody of D.R. in 2015 after she ran away from Leonard's home. Defendant contends Boggs could have also testified concerning the existence of the "Messenger" messages exchanged by his ex-wives. However, such testimony would have little relevance to the case other than to tangentially support a theory that Leonard directed D.R. to make false accusations against defendant and that D.R. did so because she feared further abuse by Leonard's boyfriend. Defense counsel did not choose to present this theory at trial, and defendant has not shown what evidence could have been presented that Leonard actually made such a request of D.R. As we have discussed, the "Messenger" messages were hearsay, and defendant has not pointed to a hearsay exception that would allow the substance of the statements to be admitted. *Supra* ¶ 74.

¶ 81                              4. *Jury Waiver*

¶ 82        Defendant argues he showed possible neglect of the case in that his trial counsel manipulated him into waiving his right to a jury trial by misleading him concerning Hagen's plea. Specifically, defendant contends his counsel falsely told him that Hagen had pled guilty to a charge of participating in a sexual act with an alleged victim in the instant case and had agreed to testify against him. Defendant contends he agreed to waive his right to a jury trial because counsel told him he would have "no chance with a jury" with Hagen testifying against him. Defendant acknowledges that his trial counsel disputed these facts but contends this factual dispute should be resolved at an evidentiary hearing rather than a preliminary *Krankel* inquiry.

- 29 -

¶ 83    Here, the trial court's determination that defendant did not show possible neglect of the case with respect to this claim was not manifestly erroneous. At the *Krankel* inquiry, the court heard from both defendant and trial counsel concerning the factual basis for this claim. Defense counsel indicated he told defendant that he had been advised Hagen would be pleading guilty to permitting the abuse of one the minor victims. Counsel also indicated the prosecutor had advised him the State would be listing Hagen as a witness. Counsel stated he advised defendant that he believed a bench trial would be more beneficial than a jury trial but that the ultimate decision belonged to defendant. In delivering its ruling, the court noted counsel had indicated he and defendant discussed the dangers and benefits of a bench trial versus a jury trial, and the court found the question of whether to pursue a bench trial or a jury trial was a matter of strategy. Under these circumstances, it is not clearly evident the court erred in finding defendant did not show possible neglect of the case with respect to his claim that counsel manipulated him into waiving his right to a jury trial.

¶ 84    5. *Failure to Correct Trial Court's Misstatement of Law*

¶ 85    Defendant also argues he showed possible neglect of the case by his trial counsel in that counsel failed to correct the trial court when it stated that once defendant waived his right to a jury trial, he could not withdraw the jury waiver for any reason. In support of this argument, defendant relies solely on his argument set forth in section II-A of this order. However, we have found the court's misleading admonishment did not render defendant's jury waiver invalid. *Supra* ¶ 37. Accordingly, the court's finding that defendant did not show possible neglect of the case with regard to this claim was not manifestly erroneous.

¶ 86    6. *Failure to Inform Trial Court Concerning Misremembered Facts*

¶ 87        Defendant contends he showed possible neglect of the case in that his trial counsel failed to inform the trial court that it had misremembered evidence concerning when defendant had owned the gold-colored car and the content of S.W.'s testimony. As we previously discussed, it is not clear from the court's challenged statements that it failed to accurately recall this evidence. *Supra* ¶¶ 52-53. Accordingly, the court's finding that defendant failed to establish possible neglect of the case with regard to this claim was not manifestly erroneous.

¶ 88                    7. *Failure to Request a Substitution of Judge for Cause*

¶ 89        Defendant argues he showed possible neglect of the case in that his trial counsel failed to file a motion to substitute judge for cause after the trial in Livingston County case No. 18-CF-161 even though defendant requested that counsel file such a motion. Defendant contends there was substantial evidence demonstrating the judge was actually prejudiced against him. See *supra* ¶ 41. Defendant notes that the only reason counsel offered for his failure to file a substitution motion was his belief that there were no grounds for such a motion, which defendant contends was incorrect.

¶ 90        A defendant seeking a substitution of judge for cause must establish actual prejudice by making a showing of " 'animosity, hostility, ill will, or distrust' " against the defendant. *People v. Patterson*, 192 Ill. 2d 93, 131 (2000) (quoting *Vance*, 76 Ill. 2d at 181). We previously found that the challenged comments made by the trial court during the trial and sentencing hearing in Livingston County case No. 18-CF-161 did not show sufficient antagonism toward defendant to make fair judgment impossible in the instant case. Accordingly, the *Krankel* court's finding that there was no clear showing of prejudice that would have supported a motion for substitution of judge was not manifestly erroneous.

¶ 91                              III. CONCLUSION

¶ 92          For the reasons stated, we affirm the trial court's judgment.

¶ 93          Affirmed.